**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **v.** | } | |
| | } | |
| **VINCENT TYRONE CURRY,** | } | **Case No.:  7:18-cr-27-MHH-SGC** |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

On January 4, 2019, this Court issued an opinion in which it granted Mr. Curry's motion to suppress evidence that law enforcement officers obtained in a search of the vehicle that Mr. Curry was driving on the date of his arrest.  (Doc. 31).  The United States has asked the Court to revisit its decision because the United States believes that the decision is flawed.  (Doc. 37).  The United States asks the Court either to reconsider and deny Mr. Curry's motion to suppress or to "clarify its rulings and, if necessary, order a supplementary evidentiary hearing and supplemental briefing."  (Doc. 37, p. 1).  The Court grants the motion to reconsider.  In this opinion, the Court will try to explain more thoroughly exactly what it did to prepare its first opinion, quote at length the evidence on which it relied, and summarize the authority on which the Court's analysis of the evidence rests.

**PROCEDURAL BACKGROUND**

Vincent Curry is charged in a one-count indictment as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). The magistrate judge who conducted the suppression hearing in this case recommended that the Court deny Mr. Curry's motion to suppress with respect to the impoundment and search conducted by the Tuscaloosa Police Department. (Doc. 24). Mr. Curry objected to the recommendation concerning the impoundment and search. (Doc. 29).[1]

Mr. Curry organized his objections under three headings, arguing generally that (1) the TPD's impoundment policy "exceeds the scope of the municipal code provision that the Government relies on as the impoundment policy's legal basis," (2) the TPD's policy "vests police officers with unchecked discretion on when to impound," and (3) the three Tuscaloosa law enforcement officers involved in the arrest and inventory search "did not follow their own policy in impounding and inventorying the automobile." (Doc. 29, p. 1).

Within those general arguments, Mr. Curry submitted that the magistrate judge improperly interpreted the relevant municipal ordinance (Doc. 29, pp. 3-4), that the police department's impoundment policy was inconsistent with the governing municipal ordinance (Doc. 29, pp. 4-6), that the impoundment policy "is

---

[1] The magistrate judge recommended that the Court suppress other evidence. (Doc. 24, p. 13). Mr. Curry did not object to that aspect of the recommendation. The Court accepted that portion of the magistrate judge's recommendation (Doc. 31, p. 2), and the United States does not challenge that aspect of the Court's decision.

cloaked in ambiguities" (Doc. 29. p. 9, n.24), and that the arresting officers did not follow the written policy because when the owner of the vehicle "arrived on the scene and asked if she could take possession of her car . . . Officers Pizana and Kabiru falsely told this woman that their policy did not allow them to release the vehicle to her, with Officer Kabiru—a Tuscaloosa police department training officer who professed familiarity with [TPD] policies—telling her repeatedly that their impoundment policy would not allow them to release her vehicle to her" (Doc. 29, p. 10). Mr. Curry cited body camera recordings in support of the last argument. (Doc. 29, p. 10, n.27). Mr. Curry pointed out that the officers, in bodycam footage, stated that they searched the vehicle because Mr. Curry had an outstanding warrant, and they had the vehicle towed because "that's policy." (Doc. 29, p. 11). Mr. Curry objected to the omission from the report and recommendation of the following facts: a bystander "told Officer Martin that Mr. Curry owned the vehicle" he was operating, Officer Martin "did not take steps" to determine who owned the vehicle, and Officers Kabiru and Pizana each inaccurately stated "that it would have been against department policy to release the car" to the woman who owned it. (Doc. 29, pp. 12-13).

In its initial memorandum opinion, the Court sustained Mr. Curry's objections. The Court discussed the ambiguity in the relevant municipal ordinance, the ambiguities that riddle the police department's written

impoundment policy, and the evidence omitted from the report and recommendation that informs the Court's determination that the TPD follows an unwritten impoundment policy when officers make an arrest incident to a traffic stop. After discussing the precedent concerning the constitutional standards for vehicle impoundments and inventories – discussion that the United States does not challenge in its motion for reconsideration – the Court applied those standards to the evidence and held that the United States did not satisfy "its burden of showing that the impoundment was reasonable or constitutionally permissible." (Doc. 31, p. 33). Accordingly, the Court suppressed the evidence "obtained as a result of the unreasonable and impermissible impoundment." (Doc. 31, p. 33).

The United States now asks the Court to reconsider its decision. (Doc. 37). Mr. Curry opposes the motion to reconsider. (Doc. 39).

**STANDARD OF REVIEW**

In its initial opinion, the Court set forth the legal standard for a district court's review of a report and recommendation concerning a motion to suppress. (Doc. 31, p. 3). The Court stated:

> A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "The district judge must consider *de novo* any objection to the magistrate judge's recommendation." FED. R. CRIM. P. 59(b)(3). A district judge reviews for "plain error or manifest injustice" factual findings to which no party has objected. *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

4

(Doc. 31, p. 3).[2]   As with Rule 53(b)(3) of the Federal Rules of Criminal Procedure, 28 U.S.C. § 636(b)(1) states that a district judge must "make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made."   Although § 636(b)(1) "does not require the [district] judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." *Thomas v. Arn*, 474 U.S. 140, 154 (1985).   That is because for dispositive motions, like motions to suppress, "the ultimate adjudicatory determination is reserved to the district judge." *United States v. Raddatz*, 447 U.S. 667, 675 (1980).

In this case, the magistrate judge's report and recommendation contains a thoughtful discussion of her findings.   Given the scope of Mr. Curry's objections and the presence in the record of the relevant municipal ordinance and TPD impoundment policy and the bodycam video from the arresting officers, the Court exercised its "broad discretion" to study all of the evidence in the suppression record. *Raddatz*, 447 U.S. at 680.   As the United States Supreme Court explained in *Raddatz*, a district court's obligation to "'make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which

---

[2] The Eleventh Circuit Court of Appeals has explained that "[f]actual issues include 'basic, primary, or historical facts,' such as external events and credibility determinations." *Martin v. Kemp*, 760 F.2d 1244, 1247 (11th Cir. 1985) (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963)).

objection is made,'" 447 U.S. at 673 (quoting 28 U.S.C. § 636(b)(1)) (emphasis in *Raddatz*), requires a district judge to "'give *fresh consideration* to those issues to which specific objection has been made by a party,'" 447 U.S. at 675 (quoting House Report No. 94-1609, p. 3 (1976)) (emphasis in *Raddatz*). The Court did just that.

**EVIDENTIARY RECORD**

The United States' motion to reconsider begins and ends with the proposition that the undersigned rejected the magistrate judge's credibility findings and substituted her own assessment of witness credibility without hearing from the witnesses.[3] That is incorrect. Based on its review of the evidentiary record, as indicated in its memorandum opinion, the Court accepted the factual findings in the report and recommendation, findings which appear to be based on bodycam footage or on the testimony of the arresting officers.[4] Accordingly, the Court accepted – and still accepts – the following findings of fact:

_____

[3] *See (*Doc. 37, p. 1) ("[T]his Court's conclusions are inconsistent with credibility determinations made by the magistrate judge"); (Doc. 37, p. 3) ("[T]his Court substituted its credibility determination for that of the magistrate judge, something it cannot do without first independently holding a hearing or, in the 'rare case' sufficiently articulating a rationale for rejecting the magistrate judge's determination.") (quoting *United States v. Cofield*, 272 F.3d 1303, 1305-06 (11th Cir. 2001)); (Doc. 37, p. 13) ("By rejecting the testimony of the three officers that they followed the General Order, this Court effectively substituted its credibility determination for that of the magistrate judge, something it could not do unless [] it reheard the officers' testimony.").

[4] The first section of the report and recommendation, labeled "Findings of Fact," does not contain citations to the evidentiary record. (Doc. 24, pp. 2-4).

- On the night of August 26, 2017, Officer Bobby Martin of the Tuscaloosa Police Department initiated a traffic stop after observing the defendant driving a vehicle with a cracked tail light on Third Avenue East. (Doc. 24, p. 1, ¶ 1).

- The defendant did not immediately pull over when Officer Martin turned on his lights and sirens, but eventually stopped in the parking area in front of a townhouse-style home located at the end of a *cul de sac* on 38th Place East. (Doc. 24, p. 2, ¶ 2).

- The residence where the defendant parked is one of several townhouses or apartments surrounding the end of the *cul de sac*. The parking area is a concrete pad extending from the street to the walkway in front of the residence. (Doc. 24, p. 2, ¶ 3).

- Officer Martin described the neighborhood where the arrest occurred as "not so safe" and agreed with characterizing it as a "high crime area." (Doc. 24, p. 2, ¶ 4).

- Once the defendant stopped the vehicle, Officer Martin approached the driver's side window and inquired why the defendant did not stop sooner; the defendant stated he did not hear the siren. (Doc. 24, p. 2, ¶ 5).

- The defendant stated his driver's license was not in the vehicle because it was at home; when Officer Martin inquired where that was, the defendant pointed at the townhome. The defendant provided Officer Martin with his social security number, which Officer Martin relayed to dispatchers over the radio. (Doc. 24, p. 2, ¶ 6).

- Dispatchers advised Officer Martin that the defendant had an active warrant for menacing. Officers Jennifer Pizana and Timothy Kabiru arrived on the scene. Officer Martin handcuffed the defendant and arrested him without incident. (Doc. 24, p. 2, ¶ 7).

- When asked whether he had any weapons on his person or in the vehicle, the defendant responded that he did not. The defendant was placed in the rear seat of Officer Pizana's cruiser. (Doc. 24, p. 3, ¶ 8).

- Dispatchers also informed Officer Martin that the defendant was not the registered owner of the vehicle. The defendant asked the officers if he could give the vehicle's keys to a woman standing nearby. However, the woman to whom the defendant wanted to give the keys also was not the vehicle's registered owner. Officer Martin told the defendant the vehicle had to be towed. (Doc. 24, p. 3, ¶ 9).

- Officer Martin asked several people standing nearby if they knew the defendant or owned the vehicle. One of the individuals stated she knew the defendant as a friend. None of the bystanders claimed to own the vehicle. (Doc. 24, p. 3, ¶ 10).

- Officer Martin conducted an inventory search of the vehicle in preparation for towing and impoundment. During the inventory search, Officer Martin found a Cobra .380 pistol under the driver's seat. (Doc. 24, p. 3, ¶ 11) (footnote omitted).

- After the pistol was found, but before the tow truck arrived, the vehicle's registered owner arrived on the scene. Officers informed the owner the vehicle was being towed and that she could claim it at the impound lot. (Doc. 24, p. 3, ¶ 12).

In discussing her conclusions of law, the magistrate judge reiterated a number of her factual findings, stating:

- During the hearing, Officer Martin characterized the neighborhood where the arrest occurred as a "high crime area." No testimony was offered to contradict this characterization . . . (Doc. 24, p. 8)[5];

---

[5] The Court respectfully disagrees with the magistrate judge's ultimate conclusion. The magistrate judge held: "No testimony was offered to contradict this characterization or cast doubt on Officer Martin's judgment that leaving the vehicle unattended posed a risk of theft, vandalism, or damage." (Doc. 24, p. 8). The disagreement rests on evidence that the magistrate judge omitted from her opinion. That evidence causes the Court to find that leaving the vehicle unattended in an off-street parking place in front of the residence where the owner of the vehicle lived did not "pose[] a risk of theft, vandalism, or damage." As the discussion below indicates, the fact that the vehicle was not at risk of theft, vandalism, or damage would not have changed Officer Martin's decision to impound the vehicle because TPD officers always impound vehicles incident to a traffic stop when an occupant of the vehicle had an outstanding arrest warrant. Officers impound the vehicle so that they may search it.

- When Officer Martin initiated the traffic stop, the defendant did not immediately stop; instead, he continued to drive until parking in front of the townhouse. While the defendant indicated the townhouse was his residence, he did not have a driver's license with him. When officers asked whether any of the bystanders knew the defendant, one individual indicated that she knew him as a friend. For whatever it is worth, the arrest report listed a different address as the defendant's residence. Moreover, the registered owner was not on the scene, and it was unclear whether the registered owner knew the defendant had the vehicle or knew where the vehicle was located. (Doc. 24, pp. 8-9).

The Court accepted – and still accepts – those findings.

As indicated in its initial memorandum opinion, the Court's decision rests on the following bodycam evidence, evidence that is not cited in the report and recommendation:

- When Officer Martin approached the vehicle [that Mr. Curry was driving], he asked Mr. Curry: "You live here?" Mr. Curry replied: "Yes, sir" and pointed to the duplex in front of the parking spot. (GX4, 1:30) – (Doc. 31, p. 4);

- Officer Martin asked: "Where is your ID at?" Mr. Curry responded: "It's in the house," and Mr. Curry again pointed to the duplex. (GX4, 5:31) – (Doc. 31, p. 4);

- After he was handcuffed but before Officer Kabiru took Mr. Curry to the police car, Mr. Curry asked if he or the police officers could give the keys to the SUV to one of the female bystanders. (GX4, 10:55-10:57). Officer Martin replied that he had to tow the car. (GX4, 11:00) – (Doc. 31, p. 5);

- Officer Martin explained to one of the bystanders outside of Mr. Curry's house: "[The SUV]'s getting towed. It has to. Because it's an arrest out of the vehicle. I have no choice. I'm required to do that. If there was a way I could help him out by not towing then I would but I can't." (GX4, Part II, 7:32-10:10) – (Doc. 31, p. 26);

- [W]hen Officer Kabiru spoke to the SUV's owner at the scene of Mr. Curry's arrest, the following transpired:

  Car Owner:  I've got it registered in my name.

  Officer Kabiru:  It's policy we're gonna have to tow it. It's just policy, yeah.

  Owner:  He going to jail?

  Kabiru:  Yeah.

  Owner:  Okay.

  Kabiru:  He's got some warrants with us. Yep.  So I understand it's yours but that's just policy.  (GX6, 17:53-18:05) – (Doc. 31, p. 27);[6]

- [W]hen Officer Kabiru called his superior officer to ask him to come to the stop, Officer Kabiru stated:  "The guy's got warrants for menacing so we want to search the vehicle."  (GX6, 10:18-10:25) – (Doc. 31, p. 28).

The United States does not acknowledge this testimony in its motion to reconsider.

In addition, the Court's initial opinion rests on the following testimony from the suppression hearing, none of which appears in the report and recommendation or in the United States' motion to reconsider:

- Officer Martin on the significance of the area in which an individual is arrested vis-à-vis an officer's decision to impound:

  Q    You mentioned earlier when you were talking to government's counsel that this was a not-so-safe area.

  A    That's correct.

---

[6] During the suppression hearing, Officer Pizana acknowledged that she and Officer Kabiru told the owner of the vehicle that she (the owner) could not have her vehicle because "it's policy." (Doc. 27, p. 73).

Q   You agreed with her that it was a high crime area?

A   That's correct.

Q   Okay.   But under the way I understood your understanding of the policy, that was a wordy sentence, under the way you explained the policy, it doesn't really matter what kind of area it is, does it, as far as the decision to tow?

A   That's correct.

Q   High crime or not, you would have always towed?

A   Yes, that's correct.

(Doc. 27, pp. 52-53).

- Officer Pizana on her routine practice in light of the permissive language in the TPD impoundment policy:

Q   And at one point that evening while you were on the scene the registered owner of the vehicle came up to you and Officer Kabiru, correct?

A   Kabiru, yes.

Q   Kabiru.  And she was asking you and Officer Kabiru if she could have the car; is that correct?

A   I believe so.  I don't recall.

Q   You don't dispute that she asked if she could take the car?

A   No, I didn't argue with her.  I said she could pick it up at the lot if she was the registered owner, and our policy is that it states that we may give it to the registered owner, doesn't say we should or shall.

[…]

Q   So she was interested in taking the car that evening?

A    Correct.

Q    You heard Officer Kabiru say he had no reason to dispute that she was the registered owner, correct?

A    In the video, correct.

Q    And you and Officer Kabiru told her it's policy, you can't have it, correct?

A    Correct.

Q    But earlier you referenced that your policy says that you, as a police officer, may release the car –

A    Which means we don't have to.  The incident already happened and we already had him under arrest and in the back of the patrol car, so at that point we just tow the vehicle due to an arrest.

[…]

Q    Well, were you following policy when you made that decision?

A    Yes.  It doesn't say that I need to give it to the registered owner.

Q    What circumstance would you have given it to the registered owner?

A    I can't speculate.

Q    Is it a decision that you make on the scene based on circumstances?

A    Every time I arrested, I tow the vehicle, if the person is driving the vehicle.

Q    Regardless of whether the registered owner is on the scene?

A    Yes.

Q    And you have been an officer for about three years?

A    Yes.

Q    So every single time someone is arrested out of a car you tow the vehicle?

A    Yes.

(Doc. 27, pp. 72-74).

- Officer Pizana on TPD policy that officers must impound a vehicle when an individual in a vehicle is arrested on an outstanding warrant:

  Q  But your statement indicates you believed he drove it to his home thinking the police were not going to tow it.

  A  I wouldn't say I believed it, I just said he brought it thinking he was going to not get it towed. A lot of people at – think that if they hurry up and get home that the police aren't going to tow their vehicle if they have warrants.

  Q  And your understanding of the policy that you followed as an officer are regardless of someone's home and they have a warrant, you tow the car?

  A  They were in the vehicle at the time of the offense, yes, and then if they happen to have warrants, we have to tow the vehicle.

  Q  You have to tow?

  A  Whether they're home or not.

  Q  Okay. So it didn't matter in your calculation of the situation that he was at home?

  A  No.

(Doc. 27, p. 76).

- Officer Kabiru on the TPD "policy" that caused the arresting officers to search the vehicle that Mr. Curry was driving because he had an outstanding arrest warrant:

  Q    And then you all call Sergeant Windham to the scene, right?

A    Yes.

Q    And he was your supervisor that evening?

A    Yes.

Q    And you tell him that you all have searched the car because Mr. Curry had warrants; is that correct?

A    That's policy, yes.

Q    I would like to play the video starting at 10[:]10.

 (Playing video)

Q    I believe you say in the vehicle.  And that is your voice talking to the sergeant?

A    Yes.

Q    And you tell him that we searched the car; is that correct?

A    That is what I said.

Q    You didn't tell the officer that we have impounded the car; is that correct?

A    That's not what I said.

Q    And you didn't tell the sergeant anything about we have impounded it because we're concerned about the area the car is sitting in; is that correct?

A    That's not what I said.

Q    And you didn't say you inventoried the car related to the tow, correct?

A    I believe I said searched.

Q    Searched.  And you said we searched it because he has a warrant.

14

A     Yes.

(Doc. 27, pp. 82-84).

- Officer Kabiru on his conversation with the tow truck driver regarding the officers' search of the vehicle that Mr. Curry was driving:

    Q     Right there you're telling the tow truck driver that you searched the car, correct?

    A     That is what I said.

    Q     You didn't use the word inventory.

    A     No, I did not.

    Q     You didn't say we're impounding the car for concern about the safety of it?

    A     No.

    Q     You say we're searching because he has warrants, correct?

    A     That is what I said.

    Q     And could there be any type of situation you would have not towed this truck in your understanding of the policy?

    A     No.

(Doc. 27, pp. 91-92).

The United States provided a number of excerpts from the arresting officers' testimony in its motion to reconsider.  (Doc. 37, pp. 10, 15-20).  None of those excerpts recount the testimony quoted above.

**STATUTORY CONSTRUCTION**

- Tuscaloosa's Impoundment Ordinance

In its initial memorandum opinion, the Court found that "Tuscaloosa's municipal ordinance regarding impoundments . . . is subject to two possible interpretations." (Doc. 31, p. 14). Tuscaloosa Municipal Ordinance 3327 § 1, 11-19-91, Section 22-10, provides:

> *Authority to impound.* Whenever the director of transportation or any police officer of the city shall find upon any street of the city or upon any street within the police jurisdiction of the city any vehicle which he has reasonable cause to believe to be lost, stolen or abandoned; or any vehicle which is, or is likely to become, an obstruction on a street or to be without proper protection by reason of the person in charge or control thereof having been arrested; or any vehicle which has remained parked on any public street continuously for a longer time than twenty-four (24) hours; or any vehicle parked at a place, in a manner or for a length of time which is unlawful; or any vehicle which is found to contain contraband, he shall have authority to immediately remove such vehicle or cause the same to be removed and impounded at police headquarters or at any authorized location. If the vehicle is parked illegally in a fire lane, the fire chief or his duly authorized representative shall have such authority.

(Doc. 22-4, p. 1, Sec. 22-10(a)). The Court identified the standard for a court's construction of a municipal ordinance and described the two possible constructions of the ordinance. (Doc. 31, pp. 14-17). One construction permits impoundments only from city streets. (Doc. 31, pp. 15-16). The other:

> does not limit impoundments to vehicles located on city streets, but this construction does limit the circumstances under which a police officer may impound a vehicle incident to arrest. Under this construction of Section 22-10(a), the police may impound a vehicle

incident to arrest only if the vehicle is, or is likely to become, an obstruction on a street or is or is likely to be without proper protection because of the arrest of the vehicle's operator.

(Doc. 31, p. 17).

In its motion to reconsider, the United States does not challenge the Court's finding that Section 22-10(a) is open to two possible constructions. The Court does not believe it misinterpreted the ordinance.

- TPD's written impoundment policy

In its memorandum opinion, the Court agreed with Mr. Curry's contention that the TPD's written impoundment policy "is cloaked in ambiguities." (Doc. 29. p. 9, n.24; Doc. 31, p. 19). The Court explained that the impoundment policy expressly states that it applies "where the driver/owner has been arrested from the vehicle," and the policy explains that "[t]he purposes of *inventorying* vehicles being towed to a private wrecker lot or placed on the city impound lot are to protect the vehicle owner's property and to protect the police department and its officers as well as local towing companies, from groundless claims." (Doc. 22-2, p. 1; Doc. 31, p. 7) (emphasis added). The department's written policy states that an officer "normally" should impound "any vehicle whose owner/driver is arrested from that vehicle." (Doc. 22-2, p. 1). The TPD's written impoundment policy diverges from Tuscaloosa's impoundment ordinance because impoundments under the TPD's written policy are not limited to arrests from vehicles located on city

streets or to arrests from vehicles that would be "without proper protection" because of the arrest of the "driver/owner" or "owner/driver" (accepting either potential construction of Section 22-10).[7]  Thus, the TPD's written impoundment policy exceeds the scope of the authorizing municipal ordinance.

In its memorandum opinion, based on its discussion on the constitutional standard for vehicle impoundments and inventories, the Court reasoned that if the TPD's written impoundment policy "provided reasonable, standard criteria for impoundments, and the Tuscaloosa Police Department 'administered [the General Order] in good faith' and not as a means to search for evidence of a crime, then the General Order, though broader than the authorizing municipal ordinance, likely would provide a basis for a constitutional impoundment."  (Doc. 31, p. 18) (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 (1987)).  In its motion to reconsider, the United States does not take issue with that aspect of the Court's analysis.

_____

[7] The magistrate judge stated that the written TPD policy "regarding impoundment where a driver has been arrested from the vehicle seeks 'to protect the vehicle owner's property and to protect the police department and its officers as well as local towing companies, from groundless claims.'"  (Doc. 24, p. 6) (citing Doc. 16-1, p. 1).  The undersigned respectfully disagrees with the magistrate judge's interpretation of the written policy.  The written policy does not condition an officer's decision to impound on protection of the vehicle owner's property or protection of the TPD or local towing companies.  Under the "Purpose" section of the written policy, the *inventory* that an officer makes after (s)he decides to impound a vehicle is designed to protect the contents of the vehicle and the TPD and towing companies, but the decision to impound precedes the inventory, and the decision to impound is governed by the directive that officers "will normally [] impound[]" a vehicle when the "owner/driver is arrested from that vehicle."  (Doc. 16-1, p. 1).

The Court went on to hold that the TPD's written impoundment policy is "so ambiguous that it is open to multiple interpretations, leaving it a far cry from the 'standard criteria' that insulate an impoundment policy from Fourth Amendment analysis." (Doc. 31, p. 18). In other words, the Court agreed with Mr. Curry's assertion that the written policy "is cloaked in ambiguities." (Doc. 29, p. 9, n.24). In its memorandum opinion, the Court explained that the ambiguity derives largely from the policy's use of the term "driver/owner" (or, in one instance, "owner/driver"). (Doc. 31, pp. 19-24). The United States strongly disagrees with this finding and argues that the Court's analysis of the term "driver/owner" violates "well-established tenants of statutory interpretation," leads "to absurd results," and "is inconsistent with the testimony at the hearing." (Doc. 37, pp. 5-11).

In its memorandum opinion, the Court stated:

> "Driver/Owner" may mean a driver who owns the vehicle (s)he is operating at the time of arrest, or the term may mean a driver *or* an owner.
>
> The "'meaning of [municipal policy] language, plain or not, depends on context,'" and context may negate one of two possible interpretations of a term. *Brown v. Gardner,* 513 U.S. 115, 118 (1994) (quoting *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221 (1991)). "[T]here is a presumption that a given term is used to mean the same thing throughout a statute." *Brown,* 513 U.S. at 118. A court should give an ordinance or a municipal policy its most sensible reading. *United States v. Hayes,* 555 U.S. 415, 426 (2009).

(Doc. 31, pp. 20-21). The Court recognized that Officer Martin testified that he understands "driver/owner" to mean "driver *or* owner" but found that the TPD's

19

written impoundment policy "does not make sense if 'driver/owner' means driver *or* owner." (Doc. 31, p. 21) (citing Doc. 27, p. 16) (emphasis in Doc. 31).

The United States argues that the Court "gave no weight to the plain and commonly understood meaning of the use of a '/' between two words" and cited the Eleventh Circuit Court of Appeals' statement in *Knous v. United States* that: "Courts have repeatedly recognized that a slash, solidus, or virgule is used to separate alternatives." (Doc. 37, pp. 6-7) (quoting *Knous v. United States*, 683 Fed. Appx. 859, 864 (11th Cir. 2017)). The United States continues: "As a general matter then, the Court was required to read 'driver/owner' as driver or owner." (Doc. 37, p. 7). The Court disagrees.

As noted above, consistent with the Eleventh Circuit's observation in *Knous* and consistent with Officer Martin's testimony regarding his understanding of the term "driver/owner," the Court began its analysis by working from the proposition that "driver/owner" means driver or owner.[8] The Court explained that reading

---

[8] To be clear, Officer Martin's testimony regarding his understanding of the TPD is just that and nothing more. Interpretation of the policy is a question of law for the Court. Indeed, during the suppression hearing, counsel for the United States repeatedly objected to cross-examination of Officer Martin concerning the actual meaning of the provisions of the TPD policy, arguing that he was not qualified to interpret the policy. *See* (Doc. 27, p. 34) ("Your Honor, I'm not sure that this witness as a patrol officer can define what Tuscaloosa Police Department meant by normally. I think he said what he understands the policy to be, but I don't think that he's necessarily in a position to define what he meant by the word normal."); Doc. 27, p. 35 ("This is a patrol officer who is simply saying, this is what he understands the policy to be, what he typically does. Mr. Gibson is asking him to interpret it legally and why it might have been written the way it was written.").

"driver/owner" as "driver or owner" consistently throughout the TPD policy

produced nonsense.

> For example, section 2.1.1.1 of the General Order states: "If the
> driver/owner is arrested from the vehicle and there is no evidentiary
> nature involved and no co-owner (including spouse) or other approved
> party is present to release vehicle to, the vehicle will be towed . . ."
> (Doc. 22-2, p.1). There are many instances in which a vehicle owner
> is a passenger in her vehicle while someone else drives the vehicle.
> For example, during a road trip, a vehicle owner and her child or
> friend may take turns driving. In this scenario, under 2.1.1.1, if
> "driver/owner" means driver *or* owner, then if the police arrest the
> driver who is not the owner, the police may not release the vehicle to
> the owner/passenger because (1) the driver has been arrested, and (2)
> there is no "co-owner" or "other approved party" present to take
> custody of the vehicle, so (3) "the vehicle will be towed."[9] The Policy
> section's presumption in favor of towing makes no sense in this
> scenario; there is no reason to tow the vehicle if the owner is present
> and may take custody of the vehicle.[10]

(Doc. 31, pp. 21-22).

The United States contends that the Court's reading "leads to absurd results"

(Doc. 37, p. 7) and argues that in the Court's hypothetical, the owner could take

possession of the vehicle, following the driver's arrest because "a 'co-owner' is

---

[9] Officer Martin testified that only a legal spouse or co-owner may be "an approved party," but
that makes the term "approved party" redundant of the term "co-owner" in Section 2.1.1.1.
Section 2.1.1.1 expressly refers separately to a "co-owner" and to "other approved party,"
presumably meaning someone other than the co-owner or spouse of the primary owner may be
an "other approved party."

[10] In this scenario, there would be no basis for towing under Section 22.10(a) because there
would be no risk that the vehicle would become an obstruction on a street or that the vehicle
would be without proper protection because of the arrest of the vehicle's operator. That is
precisely why the police officers in this case were not authorized under Section 22.10(a) to
impound the vehicle that Mr. Curry was driving when the owner of the vehicle asked the police
to release the vehicle to her.

necessarily also an 'owner'" (Doc. 37, p. 6). The United States' argument is contrary to the testimony at the suppression hearing. Officer Pizana testified: "Every time I arrested, I tow the vehicle, if the person [arrested] is driving the vehicle [regardless of whether the registered owner is on the scene]." (Doc. 27, p. 74). The argument also is inconsistent with a settled proposition of statutory construction: "A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (West 2012). "[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." Scalia & Garner, at 170; *see also Russello v. United States*, 464 U.S. 16, 23 (1983); *In re Failla*, 838 F.3d 1170, 1176-77 (11th Cir. 2016) (applying the presumption of consistent usage). In Black's Law Dictionary, "owner" is defined as "one who has the right to possess, use, and convey something; a person in whom one or more interests are vested." *Owner*, BLACK'S LAW DICTIONARY 1137 (8th ed. 2004). "[C]o-owner" is defined as "[a] person who is in concurrent ownership, possession, and enjoyment of property with one or more others." *Co-owner*, BLACK'S LAW DICTIONARY 359.[11]

---

[11] To avoid redundancy, the Court will not repeat here other ambiguities that the Court identified in the TPD policy or the ways in which officer testimony concerning the officers' understanding of the TPD policy were inconsistent with the written policy. (*See* Doc. 31, pp. 18-30).

The United States fairly points out ways in which the TPD potentially produces nonsensical scenarios if "driver/owner" means "a driver who owns a vehicle." (Doc. 31, pp. 8-9).[12]  But the argument merely drives home the Court's point:  ambiguity is "firmly entrenched" in the TPD's written impoundment policy (i.e. the General Order), and the ambiguity "leave[s] Tuscaloosa police officers with no meaningful guidance regarding the decision to impound."  (Doc. 31, pp. 23, 25).  Ultimately, these pervasive ambiguities are insignificant because "the record demonstrates that when Tuscaloosa police officers arrest an individual from a vehicle, officers typically adhere to an unwritten but generally understood department policy that impoundment is mandatory incident to arrest, regardless of the circumstances surrounding the arrest."  (Doc. 31, p. 25).

**TPD'S UNWRITTEN IMPOUNDMENT POLICY**

The United States argues that the Court erred in finding that the TPD's written policy is ambiguous and confusing because "the testimony at the [suppression] hearing [] showed that the [written] policy [is] not confusing to those responsible for implementing it."  (Doc. 37, p. 9).  Not so.  The testimony at the suppression hearing demonstrated that the TPD's *unwritten* impoundment policy is not confusing to the officers who implement it because that unwritten policy is

---

[12] The Court found that the TPD's impoundment policy is confusing under either possible construction of the term "driver/owner," a point the United States overlooks in its motion to reconsider.  (Doc. 31, p. 23).

clear as a bell: if a driver is "in the vehicle at the time of the [traffic] offense, yes, and then if they happen to have [outstanding] warrants, we have to tow the vehicle." (Doc. 27, p. 76). As the Court found in its memorandum opinion, the record demonstrates that officers adhere to that unwritten policy. (Doc. 31, p. 25). And the "policy" (the officers' word, not the Court's) is that officers "search" a vehicle whenever a person is arrested during a traffic stop because of outstanding warrants. (Doc. 27, pp. 82-84).

The simple contours of the unwritten "always tow" policy are plain in the statements of the arresting officers. As Officer Kabiru told his superior officer at the scene of the arrest: "The guy's got warrants for menacing so we want to search the vehicle." (GX6, 10:18-10:25). As Officer Kabiru admitted at the suppression hearing, because Mr. Curry had an outstanding warrant, it made absolutely no difference that the owner of the vehicle that Mr. Curry was driving was available to take possession of the vehicle parked outside of her residence:

Q      You say we're searching because he has warrants, correct?

A      That is what I said.

Q      And could there be any type of situation you would have not towed this truck in your understanding of the policy?

A      No.

(Doc. 27, p. 92). As Officer Pizana testified, if an individual in a vehicle at the time of a traffic stop had an outstanding arrest warrant, even if the individual

stopped his vehicle at his home, the police would tow the vehicle under TPD policy:

> Q     And your understanding of the policy that you followed as an officer are regardless of someone's home and they have a warrant, you tow the car?
>
> A     They were in the vehicle at the time of the offense, yes, and then if they happen to have warrants, we have to tow the vehicle.
>
> Q     You have to tow?
>
> A     Whether they're home or not.
>
> Q     Okay.  So it didn't matter in your calculation of the situation that he was at home?
>
> A     No.

(Doc. 27, p. 76).  Although Officer Martin testified that the neighborhood in which Mr. Curry was arrested was a high crime area (Doc, 27, p. 19), he also acknowledged on cross-examination that the character of the area in which the arrest took place had nothing to do with the decision to impound:

> Q     High crime or not, you would have always towed?
>
> A     Yes, that's correct.

(Doc. 27, p. 53).[13]

_____

[13] Although the Court did not provide in its initial memorandum opinion the lengthy verbatim quotes that it has incorporated into this opinion, in its initial opinion, the Court cited and discussed all of the evidence that is quoted in this opinion.  The United States' assertion that the Court provided no basis for drawing inferences different from those drawn by the magistrate judge (Doc. 37, p. 13) is misplaced.

The Court credited Officer Martin's testimony regarding crime in the neighborhood in which Mr. Curry was arrested, but the Court also credited Officer Martin's testimony that the incidence of crime in the neighborhood made no difference in the decision to tow. By Officer Martin's admission and consistent with the "policy" to which Officers Kabiru and Pizana testified, the officers would have towed the vehicle that Mr. Curry was driving regardless of the incidence of crime in the neighborhood in which Mr. Curry parked the vehicle.[14]

According to the officers' testimony, a single word in the "Release" section of the TPD's written impoundment policy paves the way for the TPD's "always

---

So is the United States' reliance on the passages of Officer Martin's testimony that the United States features prominently in its motion to reconsider. It is true that in response to hypothetical questions, Officer Martin testified that under the TPD's written policy, there could be instances in which he might release a vehicle when the driver of the vehicle is arrested during a traffic stop. (Doc. 37, pp. 15-18). But the facts are these. Officer Martin has never released a vehicle incident to an arrest from a vehicle. (Doc. 27, pp. 27, 38). Officer Martin testified, hypothetically, that under the TPD's written policy, he could release a vehicle "if the owner is on the scene and the driver is not the owner. If the owner is on the scene, then they can take custody of the vehicle." (Doc. 37, p. 15, citing Doc. 27, pp. 28-29). But the owner of the vehicle that Mr. Curry was driving did appear on the scene, and the officers refused her request for release of the vehicle, even though the officers had searched the vehicle, and Mr. Curry was under arrest in a police car. Officer Kabiru told the owner that he could not release the SUV to her because Mr. Curry had arrest warrants, and it was "policy" to impound the car. The consistent testimony about what TPD officers *actually* do under TPD's unwritten "policy," as opposed to what the officers *theoretically* could do under the TPD written policy, is unequivocal: if an individual has warrants, under TPD "policy," officers impound the vehicle and search the vehicle incident to the impoundment. None of the officers who testified identified a single instance in which the officer actually had released a vehicle from which an occupant was arrested on an outstanding warrant.

[14] Again, as the Court noted in its memorandum opinion, the vehicle did not have evidentiary value because the officers had the vehicle towed to a private impoundment lot rather than the city's impoundment lot. (Doc. 31, p. 24, n.16) (citing Doc. 22-2, Section 2.1.3).

tow" policy. That word is "may." (Doc. 22-2, p. 2). Officer Pizana explained her

understanding of the written policy this way:

> Q     But earlier you referenced that your policy says that you, as a police officer, may release the car –
>
> A     Which means we don't have to. The incident already happened and we already had him under arrest and in the back of the patrol car, so at that point we just tow the vehicle due to an arrest.
>
> [...]
>
> Q     Well, were you following policy when you made that decision?
>
> A     Yes. It doesn't say that I need to give it to the registered owner.
>
> Q     What circumstance would you have given it to the registered owner?
>
> A     I can't speculate.
>
> Q     Is it a decision that you make on the scene based on circumstances?
>
> A     Every time I arrested, I tow the vehicle, if the person is driving the vehicle.
>
> Q     Regardless of whether the registered owner is on the scene?
>
> A     Yes.
>
> Q     And you have been an officer for about three years?
>
> A     Yes.
>
> Q     So every single time someone is arrested out of a car you tow the vehicle?
>
> A     Yes.

(Doc. 27, pp. 73-74). Likewise, Officer Martin testified that the written policy's exception to the general presumption in favor of towing is permissive, using the word "may." (Doc. 27, p. 64). Officer Martin could not recall a single instance in three years and hundreds of traffic stops in which he had opted to release a vehicle to a co-owner or an approved party. (Doc. 27, pp. 27, 38).

Because the word "may" in the "Release" provision in the TPD written policy means officers "don't have to" release a vehicle under any circumstances, and because the written impoundment policy provides no guidance as to when an officer *should* release a vehicle (to comply with Tuscaloosa's impoundment ordinance and the constitutional underpinnings of warrantless impoundments and inventories), officers understand that the word "may" gives them permission to always impound when they make an arrest. TPD officers also understand that under TPD "policy," they *must* tow when they make an arrest during a traffic stop. As the Court explained in its memorandum opinion: "Although Officer Martin understands that the General Order allows him to release a vehicle to the vehicle's owner if the owner is not arrested, he also understands that department policy requires that he always impound a vehicle from which an individual is arrested." (Doc. 31, pp. 25-26). Officer Martin's statement to bystanders at the residence where Mr. Curry parked reflects his (Officer Martin's) understanding that because

he arrested Mr. Curry, under the TPD's "always tow" policy, he had no discretion;

he had to tow the SUV:

> [The SUV]'s getting towed. It has to. Because it's an arrest out of the vehicle. I have no choice. I'm required to do that. If there was a way I could help him out by not towing then I would but I can't.

(Doc. 31, p. 26) (quoting GX4, Part II, 7:32-10:10). Similarly, at the risk of

redundancy, Officer Kabiru's statement to the owner of the vehicle confirms the

TPD "policy": "It's policy we're gonna have to tow it. It's just policy, yeah . . .

He's got some warrants with us. Yep. So I understand it's yours but that's just

policy." *See* pp. 9-15, above.[15]

---

[15] Mr. Curry's objection to the magistrate judge's findings assumes that under the TPD's written impoundment policy, there must be instances in which an officer must release a vehicle. Thus, Mr. Curry argued that the arresting officers "did not follow their own policy in impounding and inventorying the automobile" (Doc. 29, p. 1) because when the owner of the vehicle "arrived on the scene and asked if she could take possession of her car . . . Officers Pizana and Kabiru falsely told this woman that their policy did not allow them to release the vehicle to her, with Officer Kabiru—a Tuscaloosa police department training officer who professed familiarity with [TPD] policies—telling her repeatedly that their impoundment policy would not allow them to release her vehicle to her" (Doc. 29, p. 10). Proceeding from the same assumption, in its initial memorandum opinion, the Court stated: "the record in this case demonstrates that members of the Tuscaloosa Police Department do not follow the General Order but instead adhere to an unwritten policy that officers must tow a vehicle whenever an arrest is made from the vehicle, no matter the circumstances surrounding the arrest." (Doc. 31, pp. 18-19). The assumption underlying Mr. Curry's argument and the Court's statement rests on the applicable legal standard that requires impoundments to serve a community caretaking function. The TPD's unwritten "always tow" policy eschews the community caretaking limitation on impoundments for a broader purpose, namely criminal investigation.

To be fair, because the arresting officers understand that the word "may" in the TPD's written policy means they never have to release a vehicle and because the officers also understand that under department "policy," they must always impound when they make an arrest on an outstanding warrant, the officers did not falsely tell the vehicle owner that their impoundment policy would not allow them to release the vehicle. Insofar as TPD officers understand that the word "may" in the Release section of the General Order means that they never have to release a

The United States challenges the Court's finding that the TPD follows an unwritten "always tow" policy. The United States argues that no officer testified about an unwritten policy. (Doc. 37, p. 14). True; no witness characterized the "always tow" practice as an "unwritten policy." The Court concluded that the TPD has an unwritten "always tow" policy because (1) the TPD's written policy does not state that officers should always tow when, during a traffic stop, an individual is arrested on an outstanding warrant, but (2) three TPD police officers provided consistent, uncontradicted testimony that TPD "policy" requires them to impound every time there is an arrest on an outstanding warrant during a traffic stop, and (3) the TPD's written policy does not state that officers should always tow when, during a traffic stop, an individual is arrested (for any reason), but (4) three TPD police officers repeatedly stated that TPD "policy" – again, the officers' word, not the Court's – requires them to impound every time there is an arrest during a traffic stop. That, in the Court's view, is uncontroverted evidence of an unwritten "always tow" policy. The Court's addition of the adjective "unwritten" to the officers' sworn testimony of a "policy" is not embellishment; it is fact. The United States' criticism of the Court's use of the adjective is unpersuasive and has no impact on the Court's analysis. The Court found:

vehicle, the Court withdraws its statement that officers do not follow the General Order. (Doc. 31, pp. 18-19). As the Court has tried to make clear in this opinion, TPD officers faithfully follow the TPD's "always tow" policy. The officers are not the problem; the unconstitutional "always tow" policy is the problem.

The ambiguity in the General Order occasionally may produce inconsistent approaches to an officer's decision to impound, but the record indicates that with minor exceptions, officers in the Tuscaloosa Police Department follow the unwritten department policy that officers always must impound a vehicle incident to arrest, regardless of the circumstances surrounding the arrest.

(Doc. 31, p. 27).[16]   Nothing in the motion to reconsider changes the Court's conclusion.

## DISCUSSION

In its motion to reconsider, the United States does not challenge the Court's description of the impoundment exception to the Fourth Amendment's warrant requirement. The Court will not repeat its discussion of the applicable law here but will summarize the findings that it made in its initial opinion based on the application of that precedent to the evidence in this case.

First, the United States had to prove that the search of the SUV that Mr. Curry was driving at the time of his arrest falls within the scope of one of the recognized exceptions to the Fourth Amendment's warrant requirement. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008); *United States v. Holloway*,

---

[16] In its initial opinion, the Court acknowledged that Officer Kabiru identified one instance in which he did not tow a vehicle after arresting the driver of the vehicle, but the Court also pointed out that when the owner of the vehicle that Mr. Curry was operating asked Officer Kabiru to please leave the vehicle with her at her house, Officer Kabiru stated: "It's policy we're gonna have to tow it. It's just policy, yeah . . . He's got some warrants with us. Yep. So I understand it's yours but that's just policy." (Doc. 31, p. 27) (quoting GX6, 17:53-18:05). The record does not indicate the circumstances surrounding the one instance in which Officer Kabiru did not impound a vehicle from which an individual was arrested, but Officer Kabiru's statements at the scene of Mr. Curry's arrest are crystal clear.

290 F.3d 1331, 1337 (11th Cir. 2002). Second, for the United States to carry its burden, the United States had to prove that the officers who searched the SUV "possessed the authority to impound the vehicle." *United States v. Vladeff*, 630 Fed. Appx. 998, 1000 (11th Cir. 2015) (citing *United States v. Williams,* 936 F.2d 1243, 1248 (11th Cir. 1991)). Third, the United States did not carry its burden because, as Mr. Curry argued, the evidence established that the TPD's "[always tow] policy greatly exceeds the authority extended to officers under the governing municipal ordinance, Section 22.10(a)." (Doc. 31, p. 28).

Under the two plausible constructions of Section 22.10(a), Tuscaloosa's municipal ordinance authorizes impoundment either when a vehicle is located on a city street or when a vehicle either is or is likely to become an obstruction or "is likely to be without proper protection because of the arrest of the vehicle's operator." (Doc. 31, pp. 15-17). As the uncontradicted evidence demonstrates, when making an arrest incident to a traffic stop, under the TPD's unwritten impoundment policy, if the arrest is pursuant to an outstanding warrant, TPD officers must impound a vehicle and search the vehicle even if the vehicle is not located on a city street and the vehicle has proper protection, as when the vehicle is parked at the home of the vehicle's owner or when the owner of the vehicle is present to take possession of the vehicle. As Officer Pizana explained, "[a] lot of people at – think that if they hurry up and get home that the police aren't going to tow their

vehicle if they have warrants," but that is wishful thinking in Tuscaloosa because under TPD policy, if an individual is "in the vehicle at the time of the offense, yes, and then if they happen to have warrants, we have to tow the vehicle." (Doc. 27, p. 76).

TPD's "always tow" policy not only exceeds the authority conveyed under Tuscaloosa's impoundment ordinance; the policy also runs afoul of the constitutional limits on the impoundment exception for warrantless searches. Because TPD officers do not limit impoundments to situations in which a vehicle is a hazard on a street or impoundment is necessary to "secur[e] or protect[] the car and its contents," TPD's "always tow" incident to arrest policy is not "tailored to the community-caretaking functions which, per *Opperman*, provide the foundation for impoundment." *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976); (Doc. 31, p. 28); *see also Bertine*, 479 U.S. at 372-73.

Finally, because the TPD does not administer its written impoundment policy in good faith but instead follows an unwritten "policy" that requires towing and searching whenever an individual is arrested from a vehicle on an outstanding arrest warrant, "the 'always impound' policy is but [] thinly veiled pretext for criminal investigation" that violates the prohibition on the use of impoundment as "'a purposeful and general means of discovering evidence of a crime.'" *United States v. Khoury*, 901 F.2d 948, 958 (11th Cir. 1990) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)); (Doc. 31, p. 28). In Officer Kabiru's words, the officers

wanted to search the vehicle that Mr. Curry was operating because Mr. Curry had warrants. (GX6, 10:18-10:25). The investigative purpose of the TPD's unwritten "policy" is unmistakable.

In every appellate decision that this Court located concerning policies akin to the TPD's "always tow" policy, the court of appeals held that the impoundment practice or policy violated the Fourth Amendment because the practice/policy was unreasonable in that it was not sufficiently related to caretaking of public streets or the vehicle itself. (Doc. 31, pp. 29-33). In its motion to reconsider, the United States identified no opinion in which a circuit court of appeals or a district court held that an "always tow" policy is constitutional.

Per *Bertine*, police regulations that establish the standard criteria for impoundment must be reasonable. 479 U.S. at 374; *see also United States v. Sanders*, 796 F.3d 1241, 1248 (10th Cir. 2015) ("impoundment of a vehicle located on private property that is neither obstructing traffic nor an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale."). The TPD's "always tow" policy is not reasonable because the policy is not tethered to a community-caretaking rationale. The "always tow" policy "'is an open invitation for pretextual searches justified as inventories.'" *Sammons v. Taylor*, 967 F.2d 1533,

1542 (11th Cir. 1992) (quoting *United States v. Maher,* 724 F. Supp. 1348, 1356 (D.Wyo. 1989), *rev'd on other grounds,* 919 F.2d 1482 (10th Cir. 1990)).

The impoundment in this case took place in a high crime area, but by Officer Martin's admission, the character of the area was irrelevant to the decision to impound. As Officer Martin acknowledged, high crime area or not, he always would have towed the vehicle that Mr. Curry was driving. Officer Kabiru confirmed that there was no set of circumstances in which he would not have towed the vehicle based on his understanding of department policy. In Officer Kabiru's words, the officers searched the vehicle because Mr. Curry had an outstanding arrest warrant. The officers were looking for evidence of criminal activity. The TPD's "always search" policy is unreasonable; the officers did not impound the vehicle that Mr. Curry was driving because of a community caretaking concern. The ultimate evidence of bad faith stems from the officers' refusal to allow the vehicle owner to take possession of her vehicle – a vehicle parked at her residence – even after the officers searched the vehicle and removed from it the inculpatory evidence that they found. The Court maintains its initial finding: the impoundment in this case was an unconstitutional means to investigate possible criminal activity. The impoundment was pursuant to an unreasonable "always tow" policy.

**CONCLUSION**

The Court hopefully has clarified the rationale for its decision to grant Mr. Curry's motion to suppress.  As often is the case, in hindsight, the Court believes that it could have explained its decision more clearly in its initial opinion.  The Court thanks the United States for the opportunity to set forth the reasons for its decision in greater detail here.

**DONE** and **ORDERED** this May 31, 2019.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE